**In re The WHITE MOTOR CREDIT CORPORATION, White Motor Corporation, Gemini Mfg. Co., White Farm Equipment Co., White Motor Corporation of Canada, Limited, the White Motor Credit Corporation of Canada, Limited, Debtors.**

**Bankruptcy No. B80–3360.**

United States Bankruptcy Court, N. D. Ohio.

Sept. 26, 1980.

---

Michael J. Crames, Levin & Weintraub, New York City, G. Christopher Meyer, Squire, Sanders & Dempsey, Cleveland, Ohio, for debtors.

Edward R. Brown, Arter & Hadden, Cleveland, Ohio, Joseph Patchan, Baker & Hostetler, Cleveland, Ohio, Harvey Miller, Weil, Gotshal & Manges, New York City, Forrest B. Weinberg, Hahn, Loeser, Freedheim, Dean & Wellman, Cleveland, Ohio, Michael Gallo, Nadler & Nadler, LPA, Youngstown, Ohio, David Bleich, Shearman & Sterling, New York City, Dennis M. O'Dea, Keck, Mahin & Cate, Chicago, Ill., for creditors.

Climaco, Seminatore, Lefkowitz & Kaplan, Co., Cleveland, Ohio, examiner.

## MEMORANDUM RE APPOINTMENT OF COMMITTEE UNDER 11 U.S.C. 1102(a)(1)

MARK SCHLACHET, Bankruptcy Judge.

White Motor Corp. ("Motor") and five affiliates (§ 101(2) voluntary petitions under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 101 et seq. on September 4, 1980. The manufacturing affiliates, wholly-owned and consolidated subsidiaries, are White Motor Corp. of Canada, Limited ("Canadian Motor"), White Farm Equipment Co. ("Farm"), and Gemini Manufacturing Co. ("Gemini") the two credit units, unconsolidated subsidiary White Motor Credit Corp. ("Credit") and its subsidiary White Motor Credit Corp. of Canada, Limited ("Canadian Credit"), are engaged in the business of financing wholesale and retail receivables generated by the truck and farm manufacturing operations of the operating companies.

During 1979, the White debtors had sales of approximately $1.2 billion, with Farm and the farm division of Canadian White generating heavy losses. Unsecured debt of the domestic firms excluding substantial amounts identified as "intercompany", appears roughly as follows: Credit—$253 million, Motor—$290 million, Farm—$62 million and Gemini—$2.3 million. Using rough figures again, perhaps $100 million of this $600 million is owed to vendors, debenture holders and other noninstitutional creditors. Aside from housekeeping items, Credit appears indebted to institutional lenders only while the operating concerns owe substantial sums to various other types of creditors. Certain banks, numbering 21 according to debtors' counsel, are creditors of both Motor and Credit.

At the time of filing, the Court entered an *ex parte* order providing that the six related cases would be consolidated for procedural purposes only and thereafter administered jointly. On September 8, 1980 the Court entered an Order, mailed to the ten largest creditors of each affiliate plus any entity specifically requesting notices of proceedings, calling for a September 22d hearing to consider the appointment of one or more creditors' committees pursuant to section 1102(a)(1) of the Code. Those interested in committee service were requested to file applications for committee membership and given leave to file memoranda relative to the size, composition or other matter relevant to the Court's discharge of § 1102(a)(1) duties.

Debtors-in-possession ("DIP") filed a memorandum calling for a single committee, representative of all major interests, with its number to be dictated by its function. Debtor's concern with the proliferation of committees is not so much the attendant cost as the demands which such committees place upon debtor's management and counsel. Moreover, it is urged that a single committee is warranted by the need for a "unifying effort on the part of the creditors in order to make the reorganization process work most efficiently."

Creditors of all the debtor companies have filed applications, joint submissions and numerous memoranda setting forth the

view, unanimously, that each debtor must have a separate committee under § 1102(a)(1); implicit in these filings is the notion that such committees should be composed of those willing to serve which hold the largest unsecured debts. See 11 U.S.C. § 1102(b)(1). Even then, as pointed out by Firestone, TRW and Eaton, committee activities will be monitored, pursuant to § 1102(c), to insure adequate representation of trade creditors. This view is not without foundation in light of the minority position occupied by what, for discussion purposes only, the Court has identified as $100 million of unsecured, noninstitutional debt.

The Court agrees in principle with those calling for separate committees. Absent a successful effort toward substantive consolidation, creditors of one debtor cannot be presumed to have a material or other qualifying interest in the assets or future of an affiliated debtor. The presence of disinterested yet voting members could easily divert attention from legitimate committee activities (§ 1103) and chill the initiative which, hopefully, has been brought to the reorganization environment.

As a matter of law, section 1102 indicates that each case should have a Court-appointed committee. While such language does not, preclude the Court from appointing identical committees in related cases, it cannot be said to authorize a single committee under the circumstances of these proceedings. Section 1102 indicates that each case must have a committee of unsecured creditors appointed by the Court.

At the hearing of September 22d, the Court questioned counsel for Citibank as to the effect of pre-petition set-offs, presumably shared by the consortium, on the ability of the banks to discharge their fiduciary obligation to their constituencies, i.e. the creditors of White Credit. The Court also suggested that the committee "overlapping" created by common creditors of Credit and Motor might warrant creditor concern since such creditors might be called "to represent _____ competing interests." *In re Proof of the Pudding, Inc.*, 3 B.R. 645, 649, 6 B.C.D. 338, 340 (Bkrtcy.S.D.N.Y. 1980).

In response counsel indicated, quite correctly that the disclosed possibility of estate preference claims should not disqualify the lenders from pursuing several hundreds of millions of dollars in undisputed claims against the debtors. As to the Court's second concern, it was urged that lenders would be reluctant to extend credit to affiliates were case law to preclude their full exercise of legal remedies on the basis of potential conflict of interest. Moreover, the committee proposed for Motor, advised First National of Chicago, was carefully structured as to vest numerical control in creditors with claims against Motor only.

As to Farm, its creditor community (as with Gemini) is demonstrably different in nature, and outlook perhaps, from that of Motor and Credit. Consisting of trade creditors only, existing orders for goods and the desire to continue a business relationship with Farm may be expected to motivate the committee with equal, if not greater purpose than the desire to recover on existing indebtedness. Concurrently, farm operations have been scrutinized by Whites' new management team and may be dealt with decisively—and soon—as a necessary step toward reorganization. The Court has no doubt that anything other than a separate Farm Committee is untenable.

Accordingly the Court has concluded that a separate committee for each debtor is indicated. In accordance with that conclusion, and to facilitate a speedy commencement of committee activity, the Court has caused telephonic notice to be given to numerous appointees and their appointments have been docketed. A final order of appointment will be issued in due course.